REO MOVERS, INC., Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Charles Aikerson, Appellee).

First District (Industrial Commission Division)   No. 1—90—3650WC

Opinion filed February 21, 1992.

Galliani, Doell & Cozzi, Ltd., of Chicago, for appellant.

Kaplan, Sorosky & Anderson, Ltd., of Chicago (James L. Kaplan and Cynthia A. Freund, of counsel), for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Respondent, Reo Movers, Inc. (REO), appeals from an order of the circuit court of Cook County confirming a decision of the Industrial Commission (Commission) awarding benefits to the claimant, Charles Aikerson. On appeal, REO raises two issues: whether a loaned employee relationship existed between REO and Aikerson at the time of his injury; and whether Aikerson provided notice of his injury to REO pursuant to section 6(c) of the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1981, ch. 48, par. 138.6(c)). We affirm the decision of the circuit court.

At the arbitration hearing, Aikerson testified that he was working for Surety Trucking at the beginning of 1982 as a truck driver. One of the other drivers for Surety was Jonas Jones. Jones also owned trucks and operated as J. Jones Trucking. Aikerson told Jones that he had heard that REO was hiring trucks and suggested that Jones talk to REO. Jones informed Aikerson that he had gotten the job with REO.

Aikerson testified that the job with REO started around February 1982. Jones gave him a placard to place on the truck that said "REO Movers." According to Aikerson, he and the other drivers would call REO at the end of each day to be instructed where to go the next day. He would speak either to Bob or Tom. Aikerson would be told what jobsite to go to, what type of substance he would be hauling and what route to take. The next morning, Aikerson would pick up a truck from Jones. Jones never came out to the jobsite. Aikerson never received an order of any kind on what he was to haul or where he was to haul it from anyone other than the people at REO.

Aikerson further testified that he would pick up a check from REO which would be made out to Jones; he would cash the check and pay the driver and give the balance to Jones. REO did not take any deductions out of the check. Aikerson was given a book in which to make daily entries of the loads transported. Each week, he would

take that week's pages out of the book, staple them together and turn them in to REO.

Aikerson further testified that on February 9, 1982, he was injured when a clod of dirt weighing between 300 and 500 pounds fell out of the truck and onto him, breaking his leg. He was hospitalized until February 13, 1982. On February 14, 1982, he received a visit at home from Jones, who told him he had been informed of Aikerson's accident on the day it happened. He returned to work on April 2, 1982. Admitted into evidence was a letter dated August 31, 1982, from Aikerson's attorney to REO enclosing a copy of Aikerson's application for benefits form.

On cross-examination, Aikerson assumed but did not know for certain whether there was a written contract between Jones and REO. Jones and he made the arrangements as to how he would be paid. REO had no control over how much he would be paid. The only piece of equipment he used was the truck furnished to him by Jones. If Aikerson was not able to go to a jobsite, then one of Jones' other drivers would go there in his place. When Aikerson would call to get instruction, he would identify himself as being from J. Jones Trucking. According to Aikerson, Jones did not determine which driver would take which truck, as each driver had a specific truck he drove.

Jonas Jones testified that he operated J. Jones Trucking, which consisted of trucks and a garage. While he was working for Surety Trucking, Aikerson told him he had heard that REO was hiring. Jones met with Bob Hughes. Because Jones was not licensed by the Illinois Commerce Commission (ICC), Hughes provided him with signs for Jones' trucks so he could operate under REO's ICC license.

Jonas further testified that initially he would call REO to get the information on the job but after that, the drivers did all the calling in. He never went out to any of the jobsites and did not direct Aikerson or any of the drivers to any jobsites other than where REO had told them to go. He did not direct the drivers to haul for anyone other than REO nor did he do business with any other companies during the same time period. He confirmed that Bob or Tom from REO would instruct the drivers. Jones had no direct contact with the drivers during the day. REO would pay him, and he would then pay his drivers.

Jones further testified that he spoke to Tom from REO about Aikerson's accident, but he did not remember when the conversations took place.

On cross-examination, Jones testified that he chose the drivers for the REO job. Sometimes Aikerson would endorse and cash the REO

checks for Jones. After the first week, the drivers began calling REO to get information on the next day's work.

Thomas Littleton testified that he is the senior vice-president of REO. There was a written agreement for the hauling of dirt between REO and Jones Trucking, but Littleton had been unable to locate it. During the course of the agreement, Littleton would contact Jones Trucking as to how many pieces of equipment were needed and what site the drivers were to go to. He would talk to whoever answered the telephone; several times it was Jones, and he also spoke to Aikerson. REO also provided Jones with stickers showing REO's ICC number on them.

Littleton further testified that as part of his duties, he would contact trucking companies, such as J. Jones Trucking. He was also responsible for writing out checks which were then signed by the president or the secretary. Robert Lewis, president of REO, signed the contract with J. Jones Trucking. When Littleton would contact the trucking companies, he would discuss where they were supposed to be and how many trucks were needed. He did not provide any other directions to them. REO provided no supervision of the trucks on the jobsites. The truck drivers would sometimes come to the REO office to pick up checks or to turn in work tickets.

Littleton further testified that under the agreement with J. Jones Trucking, REO could not terminate any individual driver but could only terminate the agreement with J. Jones Trucking. Jones provided his own trucks, but from time to time he might rent a trailer from REO, if necessary. REO did not pay any of Jones' fuel expenses. REO did not enter into agreements with any individual drivers during this period.

On cross-examination, Littleton testified that the only way that Jones could haul dirt was to operate under someone else's license, in this case, REO's. Under its ICC license, if the drivers work directly for REO, Littleton would withhold taxes and pay for insurance for them. He would also have to certify that the drivers had the proper licenses to operate trucks. Even if he found that one of Jones' drivers did not have the proper license, he could not tell Jones to fire the driver. All he could do was to cancel the agreement with Jones. However, the written agreement between Jones and REO did not specifically address that situation. In the event he had discovered one of Jones' drivers drunk while driving a load under REO's ICC license, he would have told Jones that he (Littleton) would fire Jones unless Jones did something about it.

Littleton further testified that on certain occasions, Jones would rent trailers from REO. Such trailers could be used in hauling dirt. The ticket books were supplied to Jones by REO but Jones sometimes used ticket forms that were not supplied by REO.

Charles Aikerson testified on rebuttal that he would call Tom at the end of the work day to get instructions as to where to go the next day, what time and what trucks were needed. Aikerson denied submitting ticket forms other than the ones REO supplied.

The arbitrator found that an employee-employer relationship existed between Aikerson and both J. Jones Trucking and REO and that there was proper notice to both employers. The arbitrator awarded benefits to Aikerson. On review, the Commission affirmed the decision of the arbitrator. The circuit court confirmed the decision of the Commission. This appeal followed.

REO contends that the Commission's finding that a loaned employee relationship existed between REO and Aikerson at the time of his accident on February 9, 1982, is clearly erroneous.

■■ The issue of whether an employee has been borrowed by a second employer is a question of fact to be determined by the Commission. (*County of Tazewell v. Industrial Comm'n* (1989), 193 Ill. App. 3d 309, 313.) The test for determining the loaned employee's status consists of two elements, namely, (1) whether REO had the right to direct and control the manner in which Aikerson performed the work; and (2) whether there existed a contract for hire between Aikerson and REO. (See *County of Tazewell*, 193 Ill. App. 3d at 313.) A court of review will not disturb the Commission's finding on this question unless contrary to the manifest weight of the evidence. 193 Ill. App. 3d at 313.

REO takes the position that because the facts in this case are undisputed, this case hinges on a legal issue rather than one in which the Commission must choose between conflicting factual scenarios. However, even though the facts are undisputed, where such facts permit more than one reasonable inference, then a question of fact is presented, and the conclusion of the Commission on the fact will not be disturbed by a reviewing court unless it is against the manifest weight of the evidence. (*Cary Fire Protection District v. Industrial Comm'n* (1991), 211 Ill. App. 3d 20, 25.) A reviewing court will not overturn the Commission's finding simply because different inferences could be drawn or otherwise substitute its judgment for that of the Commission. *Cary Fire Protection District*, 211 Ill. App. 3d at 25.

We are of the opinion that there was sufficient evidence in the record from which the Commission could properly infer that REO had

the right to control and direct Aikerson's work. REO points to the fact that Aikerson picked up a truck from Jones each morning to do the hauling for REO; that REO did not pay for the fuel for the trucks; that someone from REO would call Jones with the information about the next day's work; that only Jones could have fired Aikerson or the other drivers; and that Aikerson was paid by Jones.

On the other hand, Aikerson testified that all of his instructions as to the performance of his job came from REO, including what material he was to haul, his destination and the route he was to take. Even though Jones testified that initially REO contacted him with the information, Jones merely served as a conduit for determinations previously made by REO. Aikerson's truck had an REO sign to enable him to operate under REO's ICC license. REO furnished the ticket books to keep track of the loads hauled and on the basis of which Aikerson would be paid. The ticket book was turned in to REO, not to Jones. Aikerson's pay arrangement with Jones was for 33% of the gross amount received from REO. Often Aikerson would cash REO's check and pay the other drivers and himself before turning the remaining proceeds over to Jones.

■ REO argues that REO could not discharge or fire Aikerson and, therefore, he could not be deemed to be an employee of REO. However, the power to discharge is but one of the factors to be considered in determining the employer's responsibility. (*County of Tazewell*, 193 Ill. App. 3d at 315.) REO also cites *Becke v. Fred A. Smith Lumber Co.* (1973), 9 Ill. App. 3d 563, for the proposition that the mode of payment is a factor to be considered in determining whether a loaned employee relationship existed. We note, however, that *Becke* is a personal injury case. (See *County of Tazewell*, 193 Ill. App. 3d at 316.) Moreover, our supreme court has held that the primary factor to be considered in the determination of whether an employee was loaned is the right to control the manner in which the work is done. *A.J. Johnson Paving Co. v. Industrial Comm'n* (1980), 82 Ill. 2d 341, 348.

■ REO points out that if for some reason Aikerson was unable to go to the jobsite Jones could send another driver in his place. It has been held that a continuation of general employment is indicated by the fact that the general employer can properly substitute another servant at any time. (*Robinson v. McDougal-Hartmann Co.* (1971), 133 Ill. App. 2d 739.) However, as indicated in the above case, the ability to substitute is one factor to be considered. Moreover, in *Robinson*, like *Jay-Cee Warehouse, Inc. v. Industrial Comm'n* (1984), 129 Ill. App. 3d 89, the test for determining whether a loaned em-

ployee situation existed was whether the employee became wholly subject to the borrowing employer's control and freed during such time from the direction and control of his master. (*Robinson*, 133 Ill. App. 2d 739.) As we have previously stated, that test is not applicable in workers' compensation actions. *County of Tazewell*, 193 Ill. App. 3d at 316.

■ We are further of the opinion that there was sufficient evidence in the record from which the Commission could properly infer that a contract for hire existed between Aikerson and REO. To establish such a contract, there must be at least an implied acquiescence by the employee in the relationship. (*County of Tazewell*, 193 Ill. App. 3d at 315.) The evidence established that Aikerson was aware he was hauling materials for REO; that he received his instructions from REO; that the truck he drove displayed an REO sign, and he took no instructions from Jones as to the performance of the job. These factors establish that Aikerson acquiesced in the relationship with REO. See *County of Tazewell*, 193 Ill. App. 3d at 315.

Finally, REO argues that the Commission's reliance on a Commerce Commission regulation in finding that REO was a borrowing employer was misplaced, as that regulation pertains to leased vehicles, and there is no evidence that REO leased vehicles from Jones. The regulation in question provides in pertinent part as follows:

"Section 1360.40 Written Lease Requirements

\* \* \*

c) Exclusive possession and responsibilities. The lease shall provide that the authorized carrier lessee shall have exclusive possession, use, control and responsibility for the equipment during such periods as the equipment is operated by or for him as the lessee of said equipment."

"Section 1360.50 Exemptions from these Leasing Regulations

\* \* \*

c) \*\*\*

\* \* \*

5) There must be a written agreement between the authorized carriers covering the equipment as follows:

A) It must be signed by the parties or their authorized representatives.

B) It must provide that control and responsibility for the operation of the equipment shall be that of the lessee from the time possession is taken by the lessee and the receipt required under Section 1360.30(b) is given to the lessor until possession of the equipment is returned to the lessor and the

receipt required under Section 1360.30 (b) is received by the authorized carrier." (92 Ill. Adm. Code §§1360.40(c), 1360.50(c)(5) (1985).)

REO points out that at the time the above regulation was admitted into evidence at the arbitration hearing the following section was omitted:

"Section 1360.10 Applicability

This Part applies to the following actions by motor carriers holding permanent or temporary operating authority from the Illinois Commerce Commission to transport property:

a) The leasing of equipment with which to perform transportation regulated by this Commission.

b) The leasing of equipment to private carriers of property by motor vehicle or shippers.

c) The interchange of equipment between motor common carriers in the performance of transportation regulated by this Commission." (92 Adm. Code §1360.10 (1985).)

Based upon section 1360.10, REO argues that the Commerce Commission regulation relied on by the Commission is not applicable because no lease existed between Jones and REO. We disagree.

Although there is no dispute that a written contract existed between REO and Jones, REO did not produce the written contract at the arbitration hearing. When asked what efforts were made to locate the written contract, Thomas Littleton testified:

"I had two warehouse people go through—which we have large crates that we store all of our old records in. I had them go through and look for them and so far they have not been able to come up with the carton that has the certificate of insurance and plus the contracts that were written at that time."

Where a party fails to produce evidence in his control, the presumption arises that the evidence would be adverse to that party. (*Saunders v. Department of Public Aid* (1990), 198 Ill. App. 3d 1076, 1082.) In *Singh v. Air Illinois, Inc.* (1988), 165 Ill. App. 3d 923, the court held that a jury should not be instructed on such a presumption where the evidence showed that there was a reasonable excuse for the failure to produce the evidence and that the evidence was equally available to the other side. However, in *In re Marriage of Leff* (1986), 148 Ill. App. 3d 792, the court allowed the presumption where the wife failed to present any evidence as to the value of her husband's business even though she had clearly attempted to gather such evidence.

■ The missing evidence in this case is the written contract which was clearly in the control of REO. The contract was not "equally available" to Aikerson since the only other copy of the contract had been given to Jones, the other adversarial party. REO's excuse for not producing the contract was not that it had been destroyed or lost, but that REO was still looking for it. However, Littleton's explanation of REO's efforts in searching for the missing contract was sketchy at best. Aikerson filed his notice of claim in August 1982. At the time of the filing of the claim, the contract between REO and Jones would hardly qualify as an "old record." Apparently at some time after that, REO went out of the trucking business, and the trucking records were placed in storage. Littleton testified at the arbitration hearing in February 1985. Thus, REO had been aware since August 1982 of its potential liability in this case and the importance of the written contract between Jones and it. Therefore, we are of the opinion that in the absence of the written contract which was under the control of REO, a presumption arises that the terms of the contract would have been unfavorable to REO and that the written contract would have shown that the contract was for a lease of equipment between REO and Jones.

As a practical matter, even without the specific terms of the contract available to us, it would be difficult to term this arrangement as anything other than a lease of equipment. A lease is defined as "a contract by which one owning such property grants to another the right to possess, use and enjoy for a specific period of time in exchange for the payment of a stipulated price, referred to as rent." (Black's Law Dictionary 800 (5th ed. 1979).) The arrangement as established by the testimony at the arbitration hearing was that Jones let REO use his trucks for its hauling materials. A sign was placed in each truck stating "REO Movers." Jones was paid compensation by REO for the use of the trucks.

Based upon the foregoing, we are of the opinion that there was sufficient evidence in the record from which the Commission could properly infer that a lease existed between REO and Jones. We note that REO does not dispute that if the Commerce Commission regulation admitted into evidence applies to the agreement between REO and Jones, it establishes that REO had control of Aikerson and that a loaned employee situation has been established.

We conclude therefore that the decision of the Commission that a loaned employee relationship existed between Aikerson and REO is not against the manifest weight of the evidence.

We do not address REO's second issue, whether notice pursuant to section 6(c) of the Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.6(c)) was given to REO, because REO has failed to provide any citation to authority in support of its argument. The issue as to notice is therefore waived. 134 Ill. 2d R. 341(e)(7).

The judgment of the circuit court is affirmed.

Affirmed.

McCULLOUGH, P.J., and LEWIS, STOUDER, and RAKOWSKI, JJ., concur.